UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
RR, A MINOR, BY AND THROUGH HER :
PARENTS, BMR AND KR, :
:
    Plaintiff, :
: CIVIL ACTION NO. 12 CIV 0314
  -against- :
:
ACT, INC., :
:
    Defendant. :
:
---------------------------------------------------------- X

## DECLARATION OF LAWRENCE LEWANDOWSKI, PH.D.

1. My name is Lawrence Lewandowski. I am over 18 years of age and, unless otherwise stated, I have personal knowledge of the matters addressed herein.

2. I am a Professor of Psychology at Syracuse University, as well as a clinical professor at Upstate Medical University in the departments of Psychiatry and research consultant in the Department of Physical Medicine and Rehabilitation. I am a licensed psychologist, and a former school psychologist. A true and correct copy of my curriculum vitae is attached at Tab A.

3. My professional expertise is in the area of neuropsychological functioning of children with known or suspected neurodevelopmental conditions, particularly learning disabilities (LD) and Attention Deficit-Hyperactivity Disorder (ADHD). I also study cognitive, behavioral, and emotional aspects of these various disorders.

4. I have taught high school and college students for more than 30 years, continue to train graduate students in psychological assessment and diagnostic practices, and supervise psychology externs and interns on such practices in schools, clinics, hospitals, and other

agencies. I have published over 100 professional articles, chapters and reports in the areas of reading, learning, testing, disability assessment, and computer-based learning interventions. Much of my research has involved test accommodations for students with disabilities.

5. I have published papers on processing and reading speed, as well as extended time, and have some new research that is in the publication pipeline on extended time allotments. I also have published work on issues of clinical impairment. The upshot of much of this research indicates that most students, with or without a disability, benefit from extended time on timed tests that have a speeded component (whether that speeded component is intentional or not), therefore, extended time is not an accommodation that is "specific" to and only benefits persons with a disability (as, for example, a test in Braille would be to a blind person). Further, our research suggests that if students are not substantially limited in a skill such as reading -- that is, they score in the average range on assessments that evaluate reading and comprehension -- extended time will allow them to outperform their peers not receiving extra time.

6. If extended time is given to someone who is already performing at an average reading level, our research suggests that the person will receive an advantage from extended time. The research further suggests that extended time should be given only to those with a properly diagnosed disability who demonstrate substantial impairment in skills that are relevant to taking a test. There are many such students in our schools today, particularly with learning disabilities, and most of them have school records from early grades forward that show: (a) the extent of their skill deficits (in reading, writing, or math); (b) resistance to appropriate intervention (*i.e.*, even specialized instruction does not bring them to age level in certain skills); (c) professional evaluations that identify and confirm their disability (psychological reports that diagnose LD and are generally repeated every three years); and (d) obvious indices of significant

impairment in their skills (below-average performance in reading, writing, or math). It is typical for students with a reading disorder or other LD to have an historical record of their disability and resulting impairment.

7.  I have served as an outside consultant over the past 20 years in connection with requests for testing accommodations. I have conducted hundreds of documentation reviews for schools and test agencies.

8.  It is a common practice for testing agencies to hire external experts to review documentation submitted in support of an accommodation request and advise on matters of disability assessment and diagnosis, level and type of functional impairment demonstrated by an applicant, as well as the appropriateness of specific test accommodations in a given case. This practice is similar to what goes on in other contexts where benefits are provided if a person meets a given definition of disabled. Examples include requests for disability benefits under the Social Security program, and requests for accommodations by college and university students. The practice of reviewing supporting documentation and providing an opinion based upon that documentation is both well established and professionally sound.

9.  I do not approach my review of an accommodation request with any preconceived bias. My recommendation is dependent on the documentation submitted, and the test agency can accept or reject the recommendation. When the documentation supports the diagnosis and the need for accommodations, as is often the case in the reviews I perform for testing agencies, I recommend that accommodations be provided.

10. Useful information can of course be obtained by personally assessing an individual, but a personal evaluation is not necessary in order to provide an informed and reliable opinion regarding whether someone meets the applicable professional criteria for a given

diagnosis. Clinical practices are supposed to be "evidence-based," meaning diagnoses and assessment of clinical impairment are based on objective indices (*i.e.*, measures of symptoms, individualized testing, grades, standardized test scores, etc.). These metrics are the bases for making determinations about someone's level of impairment and whether a person is substantially limited. Ideally, each evaluator would have access to the same or similar information in this regard so as to make the best possible accommodation decision for an applicant. That is why agencies and reviewers ask for as much documentation as is reasonably available to support a diagnosis as well as delineate the applicant's functional limitations. For cognitive impairments, certain documentation is routinely expected (*e.g.*, school records of a learning disability or medical records on ADHD or a brain injury), and reviewers will generally ask to have such materials submitted. By reviewing a complete historical record, an evaluator should be able to determine whether an individual has evidence to support a disability diagnosis as well as a substantial limitation in a major life activity. Individuals who consistently perform below average in a major life activity due to a longstanding developmental condition generally have plenty of documentation to this effect, and a determination for test accommodations is a relatively routine exercise. In many cases, however, documentation is missing, inconsistent, or contradictory to accepted criteria.

    11.    I was asked by ACT to do an independent review of the file of materials that "R.R." submitted to ACT in support of her request for testing accommodations on the ACT examination. I reviewed: (a) R.R.'s completed application form; (b) R.R.'s personal statement; (c) two psychological evaluation reports from Ann Marcotte, Ph.D. (2007, 2011); (d) letters from Dr. Marcotte to ▓▓▓ (2009) and to ACT (2012); (e) standardized test scores from ▓▓▓ (8th grade); (f) education plans from ▓▓▓ (2010-2012); (g) a

letter from Charles Weiner, who I understand is a lawyer for R.R.; and (h) a letter from the College Board approving 50% extended time accommodations for R.R. on College Board examinations.

12. I prepared a report for ACT based on my review of this information. A true and correct copy of my letter report is attached at Tab B.

13. Dr. Marcotte diagnosed R.R. with a Cognitive Disorder Not Otherwise Specified (NOS) in her 2007 evaluation report, and diagnosed R.R. with a Cognitive Disorder NOS and a Reading Disability in her 2011 evaluation report.

14. The documentation that I reviewed was missing vital information, and in some instances warranted clarification. For example, the reports from Dr. Marcotte refer to an evaluation by Dr. Luallen in 2001 that purportedly resulted in a diagnosis of a Learning Disability. This report was not provided in the documentation file. If this was the first evaluation and the first diagnosis for R.R., I would expect it to be part of the file. I also expected that if R.R. was identified with a learning disability in first grade, she would have school documentation indicating her disability status and the types of educational interventions provided, as is the case for most LD students. This too was absent from the documentation. The only school information came from the [redacted] and this seemed to begin in 2010. It is unusual for there to be a nine-year gap of school information, especially during the school years when reading problems are typically identified and treated. I suggested to ACT that it would be helpful for R.R. to provide the 2001 psychological report as well as earlier school records or other information that might confirm her disability status.

15. I also found the documentation provided by Dr. Marcotte to raise additional questions. For example, her 2007 evaluation did not diagnose a Reading Disorder; however, in

her 2011 report, Dr. Marcotte said she "re-diagnosed" R.R. with a Learning Disorder. I do not know what Dr. Marcotte meant by re-diagnosed, so I suggested to ACT that this issue be clarified. On this point, it was unclear why Dr. Marcotte used a low WIAT II reading speed score from 2007 to support a reading disorder diagnosis in 2011, but did not mention that the WIAT III reading speed scores in 2011 were average or better. If the most reliable and valid, as well as most recent, reading scores (WIAT III) show average to high average performance for reading words, pseudo-words, and passages fluently as well as good reading comprehension, as was the case for R.R., then this is important information to consider and address in the profile analysis. These data seemed to be overlooked in Dr. Marcotte's 2011 report, however.

16. From a measurement perspective, I would not discount the results from a more reliable test like the WIAT III in favor of the Nelson Denny, as Dr. Marcotte appears to have done. The Nelson Denny Reading Test was not designed as a diagnostic test, does not have appropriate age norms, and has questionable psychometric properties. If one wanted the best estimate of R.R.'s reading skills in 2011, one should rely on the results of the WIAT III. It was unclear why these results were not discussed in Dr. Marcotte's 2011 diagnostic interpretation.

17. Dr. Marcotte's 2011 report also did not discuss some other dramatic test score changes. In 2007, there was a Processing Speed score of 80, a Math Fluency score of 79, and a WIAT II reading speed score in the 1st quartile. Dr. Marcotte used these scores to suggest a problem with cognitive processing speed, and said the reading rate was slower than expected. In 2011, however, the Processing Speed score rose to 97, Math Fluency to 95, and WIAT Reading fluency and rate into the 3rd quartile. Although the scores are markedly better and all in at least the average range, these test results apparently did not alter Dr. Marcotte's opinion. These significant changes were not highlighted or explained in the 2011 report. In my opinion, the

score improvements warranted discussion and appear to support a different diagnostic conclusion.

18. I also have questions about the diagnosis of a Cognitive Disorder NOS made by Dr. Marcotte in both 2007 and 2011. It is my opinion that the documentation submitted to ACT to date does not support a diagnosis of Cognitive Disorder NOS for R.R. A diagnosis of Cognitive Disorder NOS is based on the physiological effects of a general medical condition (*e.g.*, cancer) or a central nervous system dysfunction (*e.g.*, head injury). I did not see any documentation showing that R.R. has experienced any such condition. Indeed, I was quite surprised to see Dr. Marcotte's diagnosis of Cognitive Disorder NOS, because this diagnosis is applied to individuals that have physiological-based cognitive problems due to a medical condition, use of a drug or medication, or a neurological disorder.

I also have questions about the 2011 diagnosis of a Reading Disorder. As I noted earlier, reading disorders are typically and readily identified in early childhood. Those that ameliorate with instruction are not considered disorders. Those that resist instruction are typically evaluated via a psychoeducational assessment through which an LD diagnosis is made. If R.R. falls in the latter category, she should have supporting documentation and that documentation should be provided to ACT. The documentation I have reviewed to date indicates that there was no formal diagnosis of Reading Disorder until Dr. Marcotte's 2011 report. I noted in my review for ACT that if there was earlier documentation of a reading disorder, ACT should review such information. Given that I only had Dr. Marcotte's 2011 diagnosis, I carefully reviewed the reading performances from that evaluation. As noted earlier, the WIAT III reading scores are all average to high average. I would challenge anyone to interpret those scores as evidence of a substantial limitation in reading. I believe Dr. Marcotte is relying instead on the results from the

Nelson Denny Reading Test, which were reported as low average to borderline. As I have noted, however, this test was not developed as a test to diagnose reading disorders, but rather as a measure to assist in group reading placement. It does not have good norms by age and has questionable psychometric properties (*e.g.*, the reliability of the Reading Rate measure is unsatisfactory). Given the conflicting results from the WIAT III and the Nelson Denny, I believe that measurement experts would strongly favor the WIAT III results. In the absence of other documentation, the WIAT III results certainly influenced my opinion of R.R.'s reading skills. These are not scores that indicate an impairment in reading or comprehension, much less substantial impairment, relative to average students or relative to most people in the general population.

19. According to Dr. Marcotte's 2007 report, R.R. had her lowest performance on timed tests. In 2011, however, R.R. consistently performed within the average range on most of the timed tests, with only a few exceptions. I mentioned in my initial review that R.R. seemed to perform somewhat lower on tests involving speed, regardless of the content of the test (*i.e.*, symbol coding, math facts, reading, visual-motor tasks, etc.). It does not appear that this trend is the result of a brain disorder or a reading disorder, at least given the evidence in the documentation. There are various possible alternative explanations as to why one person may work slower than others on tasks that require speed. For example, R.R. may have a methodical working style, or could feel anxious or challenged when she has to perform tasks under time constraints. Some people tend to sacrifice speed for accuracy. Some people are slow because of a condition such as brain injury, depression, Fetal Alcohol Syndrome, or a medical condition. If R.R. has some pathology that causes her to work more slowly, then that should be reflected and addressed in the documentation.

20. As I noted in my initial review (attached at Tab B), the documentation provided by R.R. in support of her request for extra testing time raised a significant number of questions regarding the two diagnoses and whether she has a reading impairment. Although not supported by the existing documentation, I did not rule out the possibility of a learning disability in my report. If such a disability exists, there must be years (2001-2011) of additional test information and school records that would corroborate the diagnosis.

21. I have reviewed a declaration from Dr. Marcotte dated February 3, 2012, which has apparently been filed in the lawsuit captioned above. In that declaration Dr. Marcotte says that the historical documentation is consistent with a Reading Disorder and Cognitive Disorder profile. However, the only documentation I can find in the file is from Dr. Marcotte herself, or from entities that appear to have relied upon Dr. Marcotte's Cognitive Disorder NOS diagnosis to authorize accommodations (namely, the College Board and the ▓▓▓▓ School). As noted above, Dr. Marcotte diagnosed a Cognitive Disorder in 2007 and added a Reading Disorder diagnosis in 2011. If there is an extensive history supporting those diagnoses, I have not seen it.

22. Similarly, Dr. Marcotte says in her declaration that there is a history of extensive learning support in school and home, including reading instruction from a learning specialist. Once again, however, I have seen no formal documentation supporting such a history, such as documentation from teachers, tutors, specialists or a school before 2010.

23. In paragraph 17 of her declaration, Dr. Marcotte references some low scores which she relies upon as evidence of R.R.'s slow processing speed and reading rate. However, as noted above, she relies on scores from 2007 that all improved significantly in her 2011 testing of R.R. As mentioned above, R.R.'s Processing Speed score went from 80 to 97, and her reading speed increased from the 1st quartile to the 3rd quartile. The 2011 scores present a significantly

different picture than the scores from 2007, and do not indicate a significant impairment in R.R.'s processing speed or reading rate. The conclusions one draws of course depend on what scores one chooses to rely on, scores from five years ago or from last year. In my opinion, the results from 2011, particularly the WIAT III reading scores, are the scores which virtually all professionals would choose to rely upon as the more reliable indicator of whether an individual currently has a disability and, if so, the extent of the resulting impairment.

24. In paragraph 18 of her declaration, Dr. Marcotte again selectively presents low scores in support of her opinion, and again neglects an abundance of reading scores that are at least average. As I noted previously, she relies on the results from the Nelson Denny, which are lower than the WIAT III scores, even though it is an inferior test psychometrically and not intended to be used as a diagnostic instrument.

25. In paragraph 19 of her declaration, Dr. Marcotte refers to the DSM IV diagnostic criteria for a diagnosis of Reading Disorder. If one were to apply R.R.'s recent WAIS IV IQ (113) and WIAT III Reading Composite (107) scores in a discrepancy analysis, R.R. would not meet DSM criteria for a Reading Disorder. It is only by using the psychometrically inferior, non-diagnostic Nelson Denny test that one might find a significant discrepancy. Here, as elsewhere, it appears that Dr. Marcotte tended to focus on the lowest scores in a profile, even if those scores have changed dramatically, and even when scores from a poor test are at odds with scores from a better test. Clarification of this reasoning is important, but it is not found in either the 2011 report from Dr. Marcotte or in her declaration.

26. If this case were to go through a more extensive evaluation process based upon a more complete set of supporting documentation, as I concluded would be appropriate after my first review, here are some of the things that would be helpful to the evaluation, all of which are

reasonably requested in a case such as this, where the individual is asking to take a standardized test in a non-standardized manner based upon a non-obvious cognitive impairment:

   a) The 2001 report from Dr. Luallen

   b) School records from 1st-8th grades indicating reading problems, a reading disorder, reading assistance, etc., as well as other relevant school records from later years

   c) Evidence of impairment in reading relative to most students

   d) Standardized test performance from state or national tests (and an indication of whether the tests were taken with or without extra time or other accommodations)

   e) An explanation of the use of a Cognitive Disorder NOS diagnosis, relative to the criteria for such a diagnosis as defined in DSM IV-TR

   f) An explanation of what Dr. Marcotte meant when she said she had done a "re-diagnosis" of R.R.'s learning disorder

   g) An explanation for relying upon Nelson Denny scores rather than WIAT III scores in the 2011 diagnosis of R.R.

27.    I do not know whether any such additional information will be forthcoming. Based on the documentation that has been provided to ACT to date, however, it is my opinion that Cognitive Disorder NOS is not an appropriate diagnosis. It is my further opinion that the Reading Disorder diagnosis is not supported by the 2011 reading scores from the most valid achievement test that was administered to her by Dr. Marcotte, the WAIT III; that the Nelson Denny test cannot and should not be relied upon to support such a diagnosis in contradistinction to the WIAT III results; and that, because reading disorders are developmental in nature, a reading disorder diagnosis should be supported with objective evidence showing significant

functional limitations over time, such as academic records, which were not found in the documentation provided by R.R. in support of her request for accommodations on the ACT test.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 8, 2012.

*Lawrence Lewandowski*
Lawrence Lewandowski, Ph.D.